UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | |
|---|---|
| KEVIN DEAN GAUTREAUX, | Civil Action No. 8:20-cv-00668-DCN-JDA |
| Plaintiff, | |
| v. | |
| | **COMPLAINT** |
| ALARIC T. CANN, STEPHEN C. CREECH, PAMELA C. DERRICK, THOMAS BYRNE, M.D., JACQUES R. DAYS, M.D., STACEY L. SMITH, M.D., JOHN DOE, AND JANE DOE, | (Jury Trial Demanded) |
| Defendants. | |

The Plaintiff above-named, complaining of the Defendants above-named, respectfully alleges as follows:

PRELIMINARY STATEMENT OF FACTS

1. The Plaintiff, Kevin Dean Gautreaux, is currently a citizen and resident of the State of South Carolina.

2. At the time of a substantial number of the acts or omissions at issue in this case, the Plaintiff was an inmate at Allendale Correction Institution in Allendale, South Carolina [hereinafter "ACI"], which is located in this Judicial District and the Aiken Division. One or more of the Defendants committed complained of acts or omissions in Allendale County, which is located in this Judicial District and the Aiken Division.

3. Defendant Alaric T. Cann, sued in his individual capacity, is a citizen and resident of the State of South Carolina and was at relevant times employed by the South Carolina Department of Corrections ("SCDC"). During all relevant times, Defendant Cann was acting in the course and scope of his employment with SCDC and under color of state law.

4. Defendant Stephen C. Creech, sued in his individual capacity, is a citizen and resident of the State of South Carolina and was at relevant times employed by SCDC. During all relevant times, Defendant Creech was acting in the course and scope of his employment with SCDC and under color of state law.

5. Defendant Pamela C. Derrick, sued in her individual capacity, is a citizen and resident of the State of South Carolina and was at relevant times employed by SCDC. During all relevant times, Defendant Derrick was acting in the course and scope of her employment with SCDC and under color of state law.

6. Defendant Thomas Byrne, M.D., sued in his individual capacity, is a citizen and resident of the State of South Carolina and was at relevant times employed by SCDC. During all relevant times, Defendant Byrne was acting in the course and scope of his employment with SCDC and under color of state law.

7. Defendant Jacques R. Days, M.D., sued in his individual capacity, is a citizen and resident of the State of South Carolina and was at relevant times employed by SCDC. During all relevant times, Defendant Days was acting in the course and scope of his employment with SCDC and under color of state law.

8. Defendant Stacey L. Smith, M.D., sued in his individual capacity, is a citizen and resident of the State of South Carolina and was at relevant times employed by

SCDC. During all relevant times, Defendant Smith was acting in the course and scope of his employment with SCDC and under color of state law.

9. Defendants John Doe and Jane Doe are/were/is/was individual(s) or entities who at all times relevant hereto, were employed by SCDC, including but not limited to unidentified staff, medical personnel, and administrators at ACI, Evans Correctional Institute, Kirkland Correctional Institute, which Defendants are sued in their individual capacities. At all relevant times, Defendants John Doe and Jane Doe were acting in the course and scope of their employment with SCDC, and under color of state law.

## NATURE OF ACTION

10. This is an action against aforementioned Defendants for compensatory damages, punitive damages, attorneys' fees, costs and all other available damages proximately caused by the Defendants' deliberate indifference of and violations of the Plaintiff's clearly established constitutional rights. The action further alleges medical malpractice arising from breaches of prevailing medical standards of care.

## JURISDICTION AND VENUE

11. This action is brought pursuant to 28 U.S.C. § 1331 and § 1343(a)(3). The substantive claims herein arise under 42 U.S.C. § 1983, violations of civil rights, and violations of the Eighth and Fourteenth Amendments to the United States Constitution.

12. A significant portion of the acts giving rise to the claim took place in this District and the Aiken Division.

## FACTUAL HISTORY AND TIMELINE

13. Plaintiff entered the South Carolina Department of Corrections in 2003 with a medical history that included hypertension, seizure disorder secondary to prior head trauma, epilepsy, hearing loss in both ears, and antisocial personality disorder. The seizures and hypertension were well-controlled with medications at the time of Plaintiff's incarceration.

14. At approximately 11:00 p.m. on February 8, 2017, Plaintiff, while in his cell at Allendale Correctional Institute, began to complain of a severe headache and ear pain. A few minutes later, it became obvious that something was seriously wrong. Plaintiff's speech became slurred and he could not walk. He fell while trying to walk, hitting his head on the wall. After he fell, he began having a seizure and could not communicate. Within a few minutes after the initial onset of symptoms, Plaintiff's cell mate, Travis Ashby, began kicking the door and yelling to get someone's attention to help.

15. An officer, believed to be Sergeant Alaric Cann, came to the cell. Mr. Ashby explained to Sgt. Cann what was happening. Sgt. Cann tried to communicate with Plaintiff from outside the cell, but it was obvious Plaintiff was unable to effectively communicate. Plaintiff did manage to communicate that he thought he was having a stroke, and Mr. Ashby agreed.

16. Mr. Ashby explained what he had just witnessed to Sgt. Cann. Sgt. Cann did not enter the cell or otherwise render any aid. Sgt. Cann told Plaintiff and Mr. Ashby there was nothing he could do until 6:00 a.m., at which point someone would take Plaintiff to medical.

17. Over the course of the night, Plaintiff's condition continued to worsen. Plaintiff was in tremendous pain, and his ability to speak and walk continued to decline as time passed. At one point, Plaintiff lost control of his bladder and urinated on himself. Mr. Ashby helped Plaintiff get to the bathroom and assisted Plaintiff with changing his underwear.

18. On or about February 9, 2017 at approximately 6:00 a.m., Mr. Ashby began yelling for help again. An officer believed to be Sergeant Stephen Creech came to the cell door. Mr. Ashby explained to Sgt. Creech what had happened, and that Sgt. Cann had promised that someone would take Plaintiff to medical at 6:00 a.m. Mr. Ashby explained to Sgt. Creech that Plaintiff's condition had worsened during the night and he needed immediate medical attention. It was plainly obvious to anyone who laid eyes on Plaintiff that Plaintiff was experiencing a very serious medical emergency. Sgt. Creech promised to check on it and return in a few minutes.

19. On or about February 9, 2017, between 7:00 a.m. and 7:30 a.m., no one had returned to the cell to help as promised. Mr. Ashby began kicking the door and screaming for help again. Another officer came to the door and told Mr. Ashby to "stop kicking the damn door." Mr. Ashby explained to the officer what had happened, and that officer promised to come back in a few minutes to take Plaintiff for treatment.

20. Five (5) to ten (10) minutes later, officers came to the cell to take Plaintiff to medical. Within another approximately five (5) to ten (10) minutes, the officers returned, essentially carrying Plaintiff. The officers stated that they were going to put Plaintiff back in his cell.

21. It was obvious that Plaintiff was still experiencing a serious medical emergency and that he had received no actual treatment. Mr. Ashby ran out of the cell and refused to go back into the cell until Plaintiff was taken for proper medical treatment. Officers finally agreed to take Plaintiff for medical treatment.

22. Plaintiff was clearly experiencing an acute medical emergency, yet multiple security personnel ignored him and refused to take him for medical treatment. Plaintiff became progressively worse between the initial onset of symptoms during the evening of February 8, 2017, and the time that he was finally taken for emergency treatment on February 9, 2017, more than twelve hours later. During the time period that Plaintiff's obvious medical needs were ignored, Plaintiff was in great pain, and he continued to suffer throughout.

23. ACI records indicate Plaintiff was seen on an emergency basis "inhouse" at 8:37 a.m. on February 9, 2017, by Nurse Administrator Pamela C. Derrick. During the emergency inhouse encounter, the records reflect that Plaintiff complained of head pain on the right side of his head and ear. The records further reflect that Plaintiff described having numbness on his left side and numbness in his lips the night of February 8, 2017, and stated he was unable to keep his balance. Nurse Derrick documented that Plaintiff's left arm was slumped down and that he was hobbling when walking with staff assistance. Nurse Derrick "signed off" on the encounter at 8:46 a.m., having spent a maximum of 9 minutes with Plaintiff. Nurse Derrick did not call 911 or an ambulance even though it was obvious Plaintiff was in desperate need of emergency medical care.

24. At 9:38 a.m. on February 9, 2017, Nurse Derrick checked on Plaintiff again in response to a follow-up sick call. Nurse Derrick documented that she observed Plaintiff's left arm was "curled over" and that Plaintiff stated he could not lift his arm. She further documented that Plaintiff was on a mattress on the floor for safety purposes. Nurse Derrick made note that Plaintiff did not "attempt to move his legs." Nurse Derrick "signed off" on the encounter at 9:39 a.m. having spent just one to two minutes with Plaintiff. Nurse Derrick did not call 911 or an ambulance despite Plaintiff's obvious need for emergency medical care.

25. ACI records indicate that at 10:21 a.m. Plaintiff was complaining of pain, dizziness, and inability to move his limbs. ACI records note that Plaintiff "will be transported to Allendale County ER." At 10:22 a.m., Tracie Murphy-Tisdale, a records analyst, signed off, noting that she was concerned about an intracranial bleed from "fall last night."

26. Nurse Derrick noted a follow-up sick call at 10:38 a.m. The ACI records state "report called to Tracy at local ER" and "CRT sent to Chaplins and Q." She signed off again at 10:39 a.m.

27. Dr. Thomas Byrne finally saw Plaintiff in his cell (RHU cell 104) at 11:13 a.m., where he documented that Plaintiff could not move his left arm, and that the symptoms began the night before after Plaintiff fell and hit the wall. Dr. Byrne noted that Plaintiff's eyes favored to the left and documented his concerns of a possible intracranial bleed. Dr. Byrne further documented that Plaintiff's cellmate, Mr. Ashby, stated that Plaintiff was having seizures during the night. Dr. Byrne ordered

that Plaintiff be transported to the hospital for emergency treatment. Dr. Byrne signed off on the encounter three minutes later, at 11:16 a.m.

28. Plaintiff was transported to Allendale County Hospital for emergency treatment and underwent a head CT at 12:05 p.m. on February 9, 2017. The scan evidenced a large right-sided stroke. Plaintiff was immediately transferred to Palmetto Health Richland Hospital for further treatment. Hospital records reflect that Plaintiff reported he was in the usual state of health on February 8, 2017, until he got an acute onset of right side head and ear pain, became dizzy and when he went to get out of his prison bed he fell and hit his head. Plaintiff reported having weakness in his left upper and lower extremities that night, numbness over the right and left upper and lower extremities, and numbness over the right and left lower part of his face. Plaintiff was admitted to MICU at Palmetto Health on February 9, 2017, and underwent surgical procedures related to the stroke he had suffered.

29. Plaintiff was discharged to Kirkland Correctional Institute ["KCI"] Infirmary on February 20, 2017, with a notation that Plaintiff was not safe for general population at that time.

30. Palmetto Health hospital's records discharge instructions ordered that Plaintiff undergo the "most aggressive rehab options" available and that Plaintiff required "Acute Rehab."

31. Dr. Stacey L. Smith and Dr. Jacques Days, who were actively involved in and responsible for Plaintiff's care while at Kirkland Infirmary, failed to follow the Palmetto Richland discharge instructions and failed to ensure other medical staff appropriately followed the discharge instructions.

32. Upon his return to the Kirkland Infirmary, Plaintiff was not monitored daily, as required by Plaintiff's discharge instructions.

33. Upon his return to the Kirkland Infirmary, Plaintiff was not started on "aggressive rehab" as required by Plaintiff's discharge instructions. The Defendants at Kirkland failed to provide the regular, professional and aggressive physical therapy Plaintiff required.

34. Upon his return to the Kirkland Infirmary, Plaintiff was unable to function with loss of use of his left arm and leg and complained of decreased hearing and vision subsequent to the stroke, which issues the Defendants at Kirkland including Dr. Smith and Dr. Days did not address. Plaintiff also suffered another grand mal seizure.

35. Plaintiff suffered excruciating headaches after his surgeries and return to SCDC care. SCDC staff and medical personnel, including Dr. Smith and Dr. Daye, failed to take any adequate steps to provide Plaintiff relief from the horrific headaches Plaintiff suffered.

36. Defendants at Kirkland unreasonably and deliberately delayed in arranging placement for Plaintiff in a facility where he could receive the intensive physical theory mandated by the Palmetto Health discharge instructions.

37. In early June of 2017, SCDC records indicate Kirkland Infirmary was waiting on Plaintiff to be admitted to a rehab facility. On June 28, 2017, Dr. Smith signed off on a medical record indicating "We are currently waiting for a bed to open up at Just Care" and on a June 30, 2017 medical records note "Still awaiting for a bed to become available at Just Care." Defendants made no effort to place Plaintiff

elsewhere so that he could receive the care that was urgently required to be provided in a timely manner in order for Plaintiff to achieve significant recovery from his stroke.

38. On July 13, 2017, Plaintiff was transferred out of the Kirkland Infirmary to Evans Correctional Institution ("Evans"). Dr. Smith signed off on this discharge and noted that Plaintiff was to receive physical therapy "every other week," a patently insufficient physical therapy protocol for Plaintiff.

39. The location at Evans was not properly equipped to address Plaintiff's significant medical issues. Plaintiff was transferred back to Kirkland Correctional Institute on July 21, 2017 without having been provided any of the ordered rehabilitation or physical therapy. Plaintiff's Medical Clearance for Transfer form noted that Evans had "never received current medical record form KCI Infirmary."

40. Then, instead of transferring Plaintiff back to Kirkland Infirmary, Plaintiff was moved to E Dorm in Kirkland, a location absolutely unequipped to care for Plaintiff. SCDC medical notes from July 23, 2017, document that Plaintiff requested to be transferred out of E-Dorm and back to Kirkland Infirmary because he "can't do anything for himself."

41. SCDC failed to acknowledge this urgent and legitimate request by Plaintiff, a wheelchair-bound stroke victim. Plaintiff again requested help on July 26, 2017 when notes signed off on by Dr. Smith document the request for an inmate helper and a trapeze bar.

42. The same day, on July 26, 2017, Plaintiff was assaulted in E-Dorm by another inmate. This assault resulted directly from the failure of SCDC employees, including

Dr. Smith and other medical professionals within Kirkland Correctional Institution, to acknowledge Plaintiff's profound inability to care for himself and his urgent requests for medical help and transfer.

43. Plaintiff was finally transferred to a Wellpath LLC rehabilitation facility on or about July 28, 2017, where he remained until November 2, 2017 without significant improvement.

44. Plaintiff was transferred back to Evans on November 2, 2017. Upon intake at Evans, Plaintiff stated "my left side is dead, and I can't walk at all." Intake personal at Evans observed Plaintiff's left arm to be flaccid and that he could only move his left leg a little.

45. As before, Evans was not properly or adequately equipped to manage Plaintiff's profound and urgent medical needs. Upon arrival, he was not initially assigned to a handicapped room, but rather a downstairs room in a flood zone. Plaintiff had to inform intake personal that he would not be able to access his room due to his wheelchair and further had to educate staff regarding his need for assistance in dressing, and transfers from his wheelchair to the bed and the toilet.

46. While at Evans, Plaintiff repeatedly notified staff that he needed more physical therapy, which was not provided to him. Medical records from between November 2, 2019 and his release from SCDC do not document that Plaintiff had any encounters with a physician, outside of one "telemedicine" remote visit with a psychiatrist. Plaintiff was attended solely by physician assistants and nurses, despite being profoundly handicapped.

<u>THE PRISON LITIGATION REFORM ACT DOES NOT APPLY</u>

47. At the time this action was filed, the Plaintiff was no longer incarcerated and therefore, the Prison Litigation Reform Act does not apply in this case. Accordingly, the Defendants do not have an "exhaustion of administrative remedies" defense, nor do any PLRA attorney's fees caps apply.

## FIRST CAUSE OF ACTION
(U.S. Constitutional Violations - 42 U.S.C. § 1983)

48. Plaintiff incorporates all paragraphs above as if fully stated herein.

49. At all relevant times, Defendants were persons acting under color of state law, and are sued in the capacities set forth above for violating the Plaintiff's constitutional rights afforded to him by the Eight and Fourteenth Amendments to the United States Constitution.

50. At the time of the incidents at issue, the Plaintiff had clearly established rights under the United States Constitution.

    a. To be free from cruel and unusual punishment;

    b. To be free from deliberate indifference to a substantial risk of serious harm;

    c. To be free from state created danger;

    d. To bodily integrity; and

    e. To adequate medical care and to be free from deliberate indifference to medical needs.

51. The Defendants, including the unknown SCDC actors, John Doe and Jane Doe, violated these clearly established rights in the ways described in summary form herein, and in ways that may be determined in discovery and at trial.

52. The unconstitutional misconduct described herein was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for Plaintiff's clearly established constitutional rights.

53. The callous acts of the Defendants as described herein constitute malice or willful and wanton conduct.

54. The Defendants participated in or condoned conduct constituting the aggravating factors giving rise to punitive damages in that their actions amount to reckless and/or callous indifference of the Plaintiff's rights guaranteed by the Constitution of the United States of America.

55. As a result of the acts and/or omissions described herein, the Plaintiff is entitled to a recovery of punitive damages to be determined by a jury.

56. As a direct and proximate result of the above constitutional violations, Plaintiff has suffered exacerbation of his injuries and permanent harm and disability, he will require extensive future medical and life care expenses, he has and will continue to suffer severe and extreme physical and mental pain and suffering, for which he is entitled to an award of actual and punitive damages in an amount to be determined by the jury.

WHEREFORE, Plaintiff prays for judgment against Defendants, for an award of actual, compensatory, special, general, economic, noneconomic, and punitive damages, as well as any other available damages, to be determined by a jury, that the costs of this action be taxed against the Defendants, together with attorney fees and costs, and for such other and further relief as the Court deems just and proper.

          <u>s/Charles W. Whetstone, Jr.</u>
          Charles W. Whetstone, Jr. (Fed. ID No. 4604)
          Cheryl F. Perkins (Fed. ID No. 4969)
          WHETSTONE, PERKINS & FULDA LLC
          501 Devine Street
          PO Box 8086
          Columbia, SC  29202
          (803) 799-9400
          cwhetstone@attorneyssc.com
          cperkins@attorneyssc.com


          Kyle White (Fed. ID No. 11774)
          White Davis and White Law Firm
          209 E. Calhoun St.
          Anderson, SC 29621
          (864) 231-8090
          kyle@wdwlawfirm.com


          Attorneys for the Plaintiff

Columbia, SC

February 7, 2020